1

**REICH RADCLIFFE & HOOVER LLP**
Marc G. Reich (SBN 159936)
mgr@reichradcliffe.com
Adam T. Hoover (SBN 243226)
adhoover@reichradcliffe.com
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
Phone:  (949) 975-0512
Fax: (949) 208-2839

2

3

4

5

6

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
jlifshitz@lifshitzlaw.com
1190 Broadway
Hewlett, NY 11557
Phone: (516) 493-9780
Fax: (516) 280-7376

7

8

9

10

Attorneys for Plaintiff

11

UNITED STATES DISTRICT COURT

12

NORTHERN DISTRICT OF CALIFORNIA

13

14

JOHN QUIROGA, Derivatively on Behalf of
Nominal Defendant AFFIRM HOLDINGS, INC.,

Case No: 3:23-cv-1492

15

Plaintiff,

16

v.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

17

18

19

MAX LEVCHIN, MICHAEL LINFORD,
JEREMY LIEW, LIBOR MICHALEK, JENNY J.
MING, CHRISTA S. QUARLES, KEITH
RABOIS, JACQUELINE D. RESES, and JAMES
D. WHITE,

**Demand for Jury Trial**

20

Defendants,

21

and,

22

AFFIRM HOLDINGS, INC.,

23

Nominal Defendant.

24

25

26

27

28

By and through his undersigned counsel, Plaintiff John Quiroga ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Affirm Holdings, Inc. ("Affirm" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of §10(b) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) breach of fiduciary duty for insider trading; (iv) unjust enrichment; and (v) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Affirm and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Affirm's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Kusnier v. Affirm Holdings, Inc., et al.*, Case 3:22-cv-07770 (N.D. Cal.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Affirm and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Affirm against certain of the Company's current executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 12, 2021 to the present (the "Relevant Period").[1]

2.     Affirm operates a platform for digital and mobile-first commerce in the U.S. and Canada. The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app. Particularly, Affirm offers a payment service known as "buy-

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 12, 2021 to December 15, 2021; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

now, pay-later" ("BNPL"), which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments. According to the Company, "[u]nlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties."

3. Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Affirm's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected Affirm to a heightened risk of regulatory scrutiny and enforcement action; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

4. On December 16, 2021, the Consumer Financial Protection Bureau ("CFPB") announced that it had launched an inquiry into Affirm's BNPL payment service, along with four other companies offering BNPL. The CFPB indicated that it was concerned about how BNPL leads to "accumulating debt, regulatory arbitrage, and data harvesting," and is seeking data on the risks and benefits of the products. In a statement addressing BNPL services, the CFPB Director stated, "[t]he consumer gets the product immediately but gets the debt immediately too."

5. On this news, Affirm's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Affirm's securities, Plaintiff and the Company have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

8.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

9.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

<strong>THE PARTIES</strong>

10.    Plaintiff has been a shareholder during the Relevant Period and has continuously held shares of Affirm common stock to present.

11.    Nominal Defendant Affirm is incorporated in Delaware and its current principal executive offices are located at 650 California Street, San Francisco, California 94108. The Company's common stock trades on the NASDAQ under the symbol "AFRM."

12.    Defendant Max Levchin ("Levchin") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board (the "Board") since 2012. For the fiscal years of 2021 and 2022, Defendant Levchin received $451,207,726 and $478,265 in total compensation, respectively. Defendant Levchin is named as a defendant in the Related Securities Action.

13.    Defendant Michael Linford ("Linford") has been the Company's Chief Financial Officer ("CFO") since 2018. For the fiscal years of 2021 and 2022, Defendant Linford received $13,576,678 and $7,324,809 in total compensation, respectively. Defendant Linford is named as a defendant in the Related Securities Action.

14.    Defendants Levchin and Linford are collectively referred to herein as the "Officer Defendants."

15.    Defendant Jeremy Liew ("Liew") has been a member of the Company's Board since 2013. In his role as a member of the Board for fiscal years 2021 and 2022, Defendant Liew received $246,601 and $267,895 in total compensation, respectively.

16.    Defendant Libor Michalek ("Michalek") has been a member of the Company's Board since 2021. Defendant Michalek also serves as the Company's President, Technology, Risk and

Operations. For fiscal years 2021 and 2022, Defendant Michalek received $13,591,619 and $7,347,345 in total compensation, respectively.

17.    Defendant Jenny J. Ming ("Ming") has been a member of the Company's Board since 2021. In her role as a member of the Board for fiscal years 2021 and 2022, Defendant Ming received $887,539 and $262,395 in total compensation, respectively.

18.    Defendant Christa S. Quarles ("Quarles") has been a member of the Company's Board since 2018. In her role as a member of the Board for fiscal years 2021 and 2022, Defendant Quarles received $252,685 and $278,883 in total compensation, respectively.

19.    Defendant Keith Rabois ("Rabois") has been a member of the Company's Board since 2013.

20.    Defendant Jacqueline D. Reses ("Reses") has been a member of the Company's Board since 2021. In her role as a member of the Board for fiscal years 2021 and 2022, Defendant Reses received $889,623 and $266,383 in total compensation, respectively.

21.    Defendant James D. White ("White") has been a member of the Company's Board since 2021. In his role as a member of the Board for fiscal years 2021 and 2022, Defendant White received $888,581 and $287,090 in total compensation, respectively.

22.    Defendants Liew, Michalek, Ming, Quarles, Rabois, Reses, and White are collectively referred to herein as the "Director Defendants.

23.    The Director Defendants, along with the Officer Defendants are referred to herein collectively as the "Individual Defendants."

24.    Defendant Affirm, along with the Individual Defendants are referred to herein collectively as the "Defendants."

**Related Party Non-Defendants**

25.    Noel Watson ("Watson") has been a member of the Company's Board since 2022. Watson is named solely for the purposes of demand futility.

**FIDUCIARY DUTIES ON THE INDIVIDUAL DEFENDANTS**

26.    By reason of their positions as officers, directors, and/or fiduciaries of Affirm, and because of their ability to control the business and corporate affairs of Affirm, the Individual

Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Affirm in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Affirm and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

27.     Each director and officer of the Company owes to Affirm and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

28.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Duties of the Members of the Audit Committee**

29.     Pursuant to the Audit Committee Charter of Affirm, the purpose of the Audit Committee is to:

> prepare the audit committee report required by the SEC to be included in the Corporation's annual proxy statement and to assist the Board in overseeing and monitoring: (i) the Corporation's accounting and financial reporting processes; (ii) the quality and integrity of the Corporation's financial statements and the auditing of those financial statements; (iii) compliance with legal and regulatory requirements; (iv) the Corporation's independent registered public accounting firm's qualifications and independence; (v) the performance of the Corporation's internal audit function; and (vi) the appointment, compensation, retention, oversight and performance of the Corporation's independent registered public accounting firm." [2]

30.     Specifically, the Audit Committee has the following duties, among others:

### B.     *Oversight of Annual Audit and Quarterly Reviews*

The Committee shall have the following duties and responsibilities with respect to the Corporation's annual audit and quarterly reviews:

(a) Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

---

[2] Available at https://investors.affirm.com/static-files/abee8883-ab7b-4bcd-8db1-da434fa13ae9.

(b) Review with management, the Independent Auditor and the leader of the Corporation's internal audit function, the following:

(i) all critical accounting policies and practices to be used;

(ii) any critical audit matters arising from the current period audit;

(iii) all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor;

(iv) all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and

(v) any material financial arrangements of the Corporation which do not appear on the financial statements of the Corporation; and (c) Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

### C.      *Oversight of the Financial Reporting Process and Internal Controls*

The Committee shall have the following duties and responsibilities with respect to the Corporation's financial reporting process and internal controls:

(a) Review:

(i) the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Corporation's internal audit function, through inquiry and discussions with the Independent Auditor, management and the leader of the Corporation's internal audit function; and

(ii) if applicable, the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K;

(b) Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor:

(i) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and
(ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

(c) Discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the internal audit function, assess and manage the Corporation's exposure to risk, including the Corporation's major litigation, compliance and financial risk exposures, and the steps management has taken to monitor and control such exposures, it being understood that it is the job of management to assess and manage the Corporation's exposure to risk and

that the Committee's responsibility is to discuss guidelines and policies by which risk assessment is undertaken;

(d) Provide input to management regarding the selection, review and removal of the leader of the Corporation's internal audit function;

(e) Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the leader of the Corporation's internal audit function;

(f) Review and discuss with the Independent Auditor the results of the year-end audit of the Corporation, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Corporation's financial statements should be included in the Annual Report on Form 10-K; and

(g) Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (*e.g.*, discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance).

\* \* \*

Meet periodically with the Chief Legal Officer, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Corporation, (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Corporation or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Corporation, (iii) any correspondence or other communications with regulators or governmental agencies that raise significant compliance issues, and (iv) any management actions on significant compliance matters (*e.g.*, actions taken to remediate significant compliance issues, progress of major compliance initiatives, and remediation progress of any open regulatory actions).

\* \* \*

Review the Corporation's compliance program with respect to legal and regulatory requirements, including the Corporation's Code of Conduct and Ethics (the "Code of Conduct") and the Corporation's policies and procedures for monitoring compliance therewith, and meet at least annually to discuss the Corporation's compliance program with the Corporation's Chief Legal Officer, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Code of Conduct, including any matters involving criminal or potential criminal conduct.

**Duties Pursuant to the Company's Code of Ethics & Business Conduct**

31.     The Individual Defendants, as officers and/or directors of Affirm, were also bound by the Company's Code of Ethics & Business Conduct (the "Code")[3] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Affirm, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

32.     Regarding disclosures and retention of the Company's business and financial records, the Code states:

> All Affirmers have a responsibility to ensure that Affirm's financial and business records are full, fair, accurate, timely, understandable reflections of Affirm's business and operations, and are retained pursuant to Company policy. Affirmers should never falsify, forge or improperly alter any Company records; doing so is grounds for disciplinary action up to and including termination. Any discovery of suspected falsified, forged or altered records should be reported promptly to the Ethics team or by submitting a report, either identifiably or anonymously, to our reporting hotline www.AffirmEthics.com by web, SMS or phone, per the Whistleblower Policy.

> All Affirm financial transactions must be lawful, duly authorized, properly recorded, and executed in accordance with all Company policies and controls. All Affirmers also are required to cooperate with the Company's auditors.

> All Affirmers are responsible for ensuring that our financial reports and public filings, including all reports and other documents that Affirm files with, or submits to, the U.S. Securities and Exchange Commission ("SEC"), are complete, fair, accurate, timely and understandable and otherwise satisfy applicable legal requirements and accounting standards.

> The Company may have obligations to preserve certain financial and business records, including electronic communications, in connection with existing or reasonably foreseeable legal and compliance matters, such as litigation, investigations, subpoenas, or enforcement proceedings. Electronic communications include, but are not limited to: email, messaging (Mattermost and Zoom Chat), video conferencing, electronically transmitted files, collaboration tools (Google Workspace, Asana), chat rooms, internal wikis (Confluence), text messages, phone, and fax. Upon direction from the Legal team (known as a Litigation Hold Notice), Affirmers must not alter, delete, or destroy electronic communications or information subject to a Litigation Hold Notice. Please remember that your communications on or through Affirm systems may be shared or become public through these legal events or publication in the media. Potential risks from inaccurate or misleading statements include, but are not limited to, claims of false advertising, misrepresentation, breach of contract, securities fraud, unfair disclosure, and antitrust violations.

**Control, Access, and Authority**

---

[3] Available at https://investors.affirm.com/static-files/51fd1f5a-9ffc-402a-bedb-cf35308c0af3.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Affirm, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Affirm.

34.     Because of their advisory, executive, managerial, and directorial positions with Affirm, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Affirm.

35.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Affirm and was at all times acting within the course and scope of such agency.

## Reasonable and Prudent Supervision

36.     To discharge their duties, the officers and directors of Affirm were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Affirm were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Affirm conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Affirm was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

### BREACHES OF DUTIES

37.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Affirm and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Affirm, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Affirm, the absence of good faith on their part, and a reckless disregard for their duties to Affirm and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Affirm.

38.     The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

39.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Affirm has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this

plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

42.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

44.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

**SUBSTANTIVE ALLEGATIONS**

**Background of the Company**

45.     Affirm operates a platform for digital and mobile-first commerce in the U.S. and Canada. The Company's platform includes point-of-sale payment solutions for consumers, merchant commerce solutions, and a consumer-focused app. Particularly, Affirm offers a BNPL payment service, which allows consumers to purchase a product immediately and pay for it at a later time, usually over a series of installments. According to the Company, "[u]nlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties."

**Materially False and Misleading Statements Issued During the Relevant Period**

46.     The Relevant Period begins on February 12, 2021, the day after Affirm issued a post-market press release announcing the Company's fiscal year 2021 second quarter results. That press release quoted Defendant Levchin, who stated, in relevant part, that Affirm's "mission has been to build honest financial products that improve lives"; that "[w]e've aligned our success with the success of both sides of the commerce ecosystem, winning when our consumers . . . win"; and that "we remain committed to empowering consumers to take control of their finances[.]"

47.     On February 17, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended December 31, 2020 (the "2Q21 10-Q"). That filing represented, in relevant part:

> Affirm . . . provides consumers with a simpler, more transparent, and flexible alternative to traditional payment options. Our mission is to deliver honest financial products that improve lives . . . . Affirm enables consumers to confidently pay for a purchase over time . . . .
>
> . . . . Consumers get the flexibility to buy now and make simple monthly payments for their purchases and merchants see . . . an overall more satisfied customer base. Unlike legacy payment options and our competitors' product offerings, which charge deferred or compounding interest and unexpected costs, we disclose up-front to consumers exactly what they will owe — no hidden fees, no penalties.

48.     The 2Q21 10-Q also stated that Affirm "ha[d] developed policies and procedures designed to assist in compliance with [various federal and state consumer protection] laws and regulations[.]"

49.     Appended as exhibits to the 2Q21 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Officer Defendants certified that the 2Q21 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] and that information contained in th[e 2Q21 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the issuer."

50.     On May 10, 2021, Affirm issued a press release announcing the Company's fiscal year 2021 third quarter results. That press release quoted Defendant Levchin, who represented, in relevant part, that "Affirm's strong third quarter results reflect continued progress toward building the most . . . transparent financial network for consumers and merchants[.]"

51.     On May 17, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2021 (the "3Q21 10-Q"). That filing contained substantively the same statements as referenced above, regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

52.     Appended as exhibits to the 3Q21 10-Q were substantively the same SOX certifications as referenced above, signed by the Officer Defendants.

53.     On September 9, 2021, Affirm issued a press release announcing its fourth quarter and fiscal year 2021 results. That press release quoted Defendant Levchin, who represented, in relevant part:

> The secular shift toward flexible and transparent financial products continues to accelerate. With our superior technology, Affirm is strongly positioned to build a more valuable two-sided network for consumers and merchants. We remain focused on extending our leadership position with our core products, while capitalizing on our vast opportunities to empower more people with the new ones we continue to launch.

54.     On September 17, 2021, Affirm filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and fiscal year ended June 30, 2021 (the "2021 10-K"). That filing contained substantively the same statements as referenced above regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers, and policies and procedures designed to assist in compliance with various federal and state consumer protection laws and regulations.

55.     Appended as exhibits to the 2021 10-K were substantively the same SOX certifications as referenced above, supra, signed by the Officer Defendants.

56.     On November 10, 2021, Affirm issued a press release announcing the Company's fiscal year 2022 first quarter results. That press release quoted Defendant Levchin, who represented, in relevant part, that "[o]ur strong quarter once again demonstrates the continued momentum across Affirm as more people embrace the transparency, flexibility and value our solutions provide[.]"

57.   The same November 10, 2021 press release also highlighted an expanded relationship with Amazon, whereby "[c]onsumers will have the option to split the total cost of eligible purchases into monthly payments at checkout with no late or hidden fees, ever[,]" and that, "[a]s part of an amended agreement, Affirm will serve as Amazon's only third party, non credit card, [BNPL] option in the U.S."

58.   On November 15, 2021, Affirm filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2021 (the "1Q22 10-Q"). That filing contained substantively the same statements as referenced above regarding Affirm's purportedly transparent, simple, and trustworthy payment solutions for consumers.

59.   Appended as exhibits to the 1Q22 10-Q were substantively the same SOX certifications as referenced above signed by the Officer Defendants.

60.   The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Affirm's BNPL service facilitated excessive consumer debt, regulatory arbitrage, and data harvesting; (ii) the foregoing subjected Affirm to a heightened risk of regulatory scrutiny and enforcement action; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

61.   On December 16, 2021, the CFPB announced that it had launched an inquiry into Affirm's BNPL payment service, along with four other companies offering BNPL. Specifically, the CFPB stated, in relevant part:

> Today the [CFPB] issued a series of orders to five companies offering "buy now, pay later" (BNPL) credit. The orders to collect information on the risks and benefits of these fast-growing loans went to [*inter alia*] Affirm . . . . The CFPB is concerned about accumulating debt, regulatory arbitrage, and data harvesting in a consumer credit market already quickly changing with technology.

> "Buy now, pay later is the new version of the old layaway plan, but with modern, faster twists where the consumer gets the product immediately but gets the debt immediately too," said CFPB Director Rohit Chopra. "We have ordered [*inter alia*] Affirm . . . to submit information so that we can report to the public about industry practices and risks."

Buy now, pay later credit is a type of deferred payment option that generally allows the consumer to split a purchase into smaller installments, typically four or less, often with a down payment of 25 percent due at checkout. The application process is quick, involving relatively little information from the consumer, and the product often comes with no interest. Lenders have touted BNPL as a safer alternative to credit card debt, along with its ability to serve consumers with scant or subprime credit histories.

*       *       *

The law requires that the CFPB monitor consumer financial markets and enables the agency to require market players to submit information to inform this monitoring. The CFPB expects to publish aggregated findings on insights learned from this inquiry. Today's orders seek to illuminate the range of these consumer credit products and their underlying business practices. Specifically, the Bureau is concerned about:

- **Accumulating debt**: Whereas the old-style layaway installment loans were typically used for the occasional big purchase, people can quickly become regular users of BNPL for everyday discretionary buying, especially if they download the easy-to-use apps or install the web browser plugins. If a consumer has multiple purchases on multiple schedules with multiple companies, it may be hard to keep track of when payments are scheduled. And when there is not enough money in a consumer's bank account, this can potentially result in charges by both the consumer's bank and the BNPL provider. Because of the ease of getting these loans, consumers can end up spending more than anticipated.

- **Regulatory arbitrage**: Some BNPL companies may not be adequately evaluating what consumer protection laws apply to their products. For example, some BNPL products do not provide certain disclosures, which could be required by some laws. And while the BNPL application may look similar to a standard checkout with a credit card, protections that apply to credit cards may not apply to BNPL products. Many BNPL companies do not provide dispute resolution protections available to users of other forms of credit, like credit cards. And finally, depending on what rules the lender is following, different late fees and policies apply.

- **Data harvesting**: BNPL lenders have access to the valuable payment histories of their customers. Some have used this collected data to create closed loop shopping apps with partner merchants, pushing specific brands and products, often geared toward younger audiences. As competitive forces pressure the merchant discount, lenders will need to find other sources of revenue to maintain growth and profitability. The Bureau would like to better understand practices around data collection, behavioral targeting, data monetization and the risks they may create for consumers.

- 

  The BNPL product has seen growth internationally and many other countries are also taking a close examination of its providers. As part of today's inquiry, the Bureau is working with its international partners in Australia, Sweden, Germany and the UK, specifically the Financial Conduct Authority. The Bureau will also be coordinating with the rest of the Federal Reserve System, as well as its state partners.

(Emphasis in original.)

62.    On this news, the Company's stock price fell $11.74 per share, or 10.58%, to close at $99.24 per share on December 16, 2021.

63.     As a result of Defendant's wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Company and its shareholders have been damaged.

## DEFENDANTS' INSIDER TRADING

64.     Certain of the Individual Defendants capitalized on the artificially inflated stock price by selling significant portions of their holdings of Company common stock. While in possession of material, adverse, non-public information, Defendants Michalek, Linford, Rabois, and Liew (the "Insider Selling Defendants") collectively sold hundreds of thousands of shares of Affirm stock for proceeds of nearly $99 million. These sales made by the Insider Selling Defendants during the Relevant Period were suspiciously large in quantity and timing and were inconsistent with their pre- and post-Relevant Period trading practices.

65.     Defendant Michalek sold 498,077 shares of his personally held Affirm stock for proceeds of $59,813,286.49 between March 2021 and November 2021.

66.     Defendant Linford sold 183,380 shares of his personally held Affirm stock for proceeds of $23,678,053.31 between March 2021 and November 2021.

67.     Defendant Rabois sold 37,408 shares of his personally held Affirm stock for proceeds of $5,196,496.37 between November 2021 and December 2021.

68.     Defendant Liew sold 68,750 shares of his personally held Affirm stock for proceeds of $10,051,759.05 in November 2021.

## DAMAGES TO THE COMPANY

69.     Affirm has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Affirm has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.  costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

b.  substantial loss of market capital;

c.  costs already incurred and to be incurred defending the Related Securities Action and;

d.  any fines or other liability resulting from the Company's violations of federal law.

70.    In addition, Affirm's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

71.    The wrongdoing complained of herein has irreparably damaged Affirm's corporate image and goodwill.  For at least the foreseeable future, Affirm will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Affirm's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

72.    Plaintiff brings this action derivatively in the right and for the benefit of Affirm to redress injuries suffered, and to be suffered, by Affirm as a direct result of violations of federal securities laws by the Defendants.  Affirm is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.    The Board of Affirm, at the time this action was commenced, consisted of Defendants Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses, and White, and related party non-defendant Watson a total of nine (9) individuals.

74.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Affirm Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

75.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

76.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Levchin Because of His**
**Principal Professional Occupation as the Company's CEO**

77.    Defendant Levchin is the Company's founder and CEO and has served in his position as CEO since 2012. Defendant Levchin is also a member of the Board. In his role as CEO of the Company for fiscal years 2021 and 2022, Defendant Levchin received $451,207,726 and $478,265 in total compensation, respectively. The Company does not claim that Defendant Levchin is an independent director and because his primary source of income and primary employment is his employment as CEO of Affirm and his professional reputation is inextricably bound to his role at Affirm, Defendant Levchin is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to Defendant Michalek Because of His**
**Principal Professional Occupation as the Company's President**

78.    Defendant Michalek serves as the Company's President, Technology, Risk and Operations. Defendant Michalek is also a member of the Company's Board. For fiscal years 2021 and 2022, Defendant Michalek received $13,591,619 and $7,347,345 in total compensation, respectively. The Company does not claim that Defendant Michalek is an independent director and because his primary source of income and primary employment is his employment as President, Technology, Risk and Operations of Affirm and his professional reputation is inextricably bound to his role at Affirm, Defendant Michalek is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Members of the Audit Committee**

79.    Demand is futile as to Defendants Ming, Quarles, Rabois, and Reses (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

80.    The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties and purpose of the Audit Committee are set forth *supra*.

81.     Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

82.     The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to Defendants Michalek, Rabois, and Liew**

83.     Demand is excused as to Defendants Michalek, Rabois, and Liew (the "Insider Selling Directors") because those Defendants directly benefited from the wrongs and acts complained of herein and face a sufficiently substantial likelihood of liability in connection with their illicit insider stock sales detailed above, which were suspicious in timing and amount, and therefore cannot possibly consider a demand to sue themselves based on those transactions in which they reaped significant benefits.

84.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings during the Relevant Period, each of the Insider Selling Directors knew the false and misleading statements made through press releases and in the Company's financial statements during the Relevant Period had caused the Company's stock price to become artificially inflated. While in possession of this material adverse non-public information regarding the Company, the Insider Selling Directors participated in the illegal insider selling set forth herein and thereby received personal financial benefits from the challenged insider trading transactions.

85.     The Company has adopted a policy concerning insider trading in the Code, which states:

While working at Affirm, Affirmers may from time to time be aware of material nonpublic information about the Company or may learn of material nonpublic information about other companies such as our merchants and partners. Under federal and state securities laws, it is illegal to trade in the securities of any company while being aware of material nonpublic information about that company. Accordingly, trading (including without limitation, in secondary market transactions and/or other transactions with third parties) in securities of Affirm or other companies while being aware of such information could constitute "insider trading" and violate the law, as could "tipping" (giving material nonpublic information to) others who then trade on the basis of that information. The consequences of insider trading or the tipping of material nonpublic information can be severe – the person violating the laws, as well as Affirm, may be subject to criminal and civil lawsuits and financial penalties in connection with a violation of the insider trading laws.

Information is "material" if a reasonable investor would consider it important in deciding whether to buy or sell securities. Information is "nonpublic" until it has been widely disseminated to the public market. This means that the information must be publicly released and sufficient time must have passed for the securities markets to digest the information. Refer to the Insider Trading Policy for examples of what may constitute material nonpublic information.

In order to facilitate compliance with insider trading laws and Affirm's Insider Trading Policy, Affirm has established quarterly trading windows. In addition, the Chief Legal Officer of Affirm may from time to time establish "special closed trading windows," during which time some or all Affirmers will be prohibited from trading in Affirm securities. Refer to the Insider Trading Policy for additional information.
Additionally, certain types of transactions involving Affirm securities are never allowed, such as: trading in publicly traded options, warrants, puts and calls or similar instruments on Affirm securities; engaging in short sales of Affirm securities; or engaging (directly or indirectly) in hedging transactions that are designed to hedge or offset any decrease in the market value of Affirm securities. Refer to the Insider Trading Policy for additional information.

86.    Accordingly, the Insider Selling Directors have violated the Company's insider trading policies and face a sufficiently substantial likelihood of liability due to their illicit trades, rendering them incapable of considering a demand.

**Demand is Futile as to the Director Defendants**

87.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

88.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and

financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

89.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

90.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Officer Defendants for

### Contribution Under Section 10(b) of the Exchange Act,

### Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

91.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.    As a result of the conduct and events alleged above, Affirm has been named as a defendant in the Related Securities Action brought on behalf of Affirm shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

93.    Federal law provides Affirm with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Affirm has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Affirm to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

94.     Accordingly, Plaintiff, on behalf of Affirm, hereby claims contribution against the
Officer Defendants, each of whom has been named in the currently pending Related Securities Action
as a joint tortfeasor with Affirm under Rule 10b-5, or if joined in such actions, would be liable for the
same damages as Affirm.

95.     Affirm claims no right to indemnification under the federal securities laws from them in
this count, but rather only claims contribution.

**Allegations Regarding the Officer Defendants**

96.     Throughout the Relevant Period, the Officer Defendants caused the Company to issue
false and misleading statements and/or omit material information in public statements and/or
Company filings concerning the Company's business and financial prospects.  These statements were
materially misleading to persons who purchased Affirm securities during the Relevant Period.

97.     The plaintiffs in the Related Securities Action allege that they relied, directly or
indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Affirm
securities, and, as a result, suffered damages because value of their investments was distorted by the
false and materially omissive statements, and they purchased such securities at such distorted prices.

98.     The damages suffered by said investors were caused by reason of the fact that (i) they
were induced to purchase said securities by the false and misleading statements alleged herein, and (ii)
the reveal of the true nature of the Company's business and prospects resulted in the decrease in price
of its securities, causing the value of shareholders investments to drop.

99.     The plaintiffs in the Related Securities Action were unaware of the false and misleading
nature of said statements and omissive disclosures.

100.   When the Officer Defendants signed off on or made the false statements and omissive
disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged
in detail herein, due to their positions as employees and/or directors of Affirm, the Officer Defendants
were privy to information regarding the Company's business and financial prospects and would have
been aware that the statements made were in fact false and misleading when made.

101.   Accordingly, the Officer Defendants are liable for damages under Section 10(b) of the
Exchange Act and Rule 10b-5 promulgated thereunder, and, if Affirm were to be held liable in the

Related Securities Action, the Officer Defendants would be liable to it for contribution.  Plaintiffs

hereby derivatively claim such right of contribution on behalf of Affirm.

**Allegations Regarding the Officer Defendants as Control Persons**

102.   In acting as alleged above, the Officer Defendants were acting as authorized agents of

Affirm in their roles as directors and/or employees.  Because of their positions of control and authority

as senior officers and/or directors, the Officer Defendants were able to, and did, control the contents of

the various reports, press releases and public filings disseminated by the Company throughout the

Relevant Period, as alleged herein.

103.   The Officer Defendants were "controlling persons" of Affirm within the meaning of

Section 20(a) of the Exchange Act, and, accordingly, the Officer Defendants could be held liable to

the plaintiffs in the Related Securities Action.  Were the Company to be held liable in said Related

Securities Action, the Officer Defendants would be liable to it for contribution.

104.   Plaintiff hereby derivatively claims such right of contribution on behalf of Affirm.

**COUNT II**

**Against the Individual Defendants for Breaches of Fiduciary Duty**

105.   Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

106.   The Individual Defendants owed and owe Affirm fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed and owe Affirm the highest obligation of

good faith, loyalty, and due care.

107.   The Individual Defendants have violated and breached their fiduciary duties of good

faith, loyalty, and due care by causing or allowing the Company to disseminate to Affirm shareholders

materially misleading and inaccurate information through the Company's SEC filings throughout the

Relevant Period.  These actions could not have been a good faith exercise of prudent business

judgment.

108.   During the course of the discharge of their duties, the Individual Defendants knew or

recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the

Individual Defendants caused Affirm to engage in the conduct complained of herein which they knew

had an unreasonable risk of damage to the Company, thus breaching their duties owed to Affirm and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

109.  As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

110.  Plaintiff, on behalf of Affirm, has no adequate remedy at law.

**COUNT III**

**Against the Insider Selling Defendants for Breach**

**of Fiduciary Duties for Insider Trading and Misappropriation of Information**

111.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112.  The Insider Selling Defendants, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public.  These Defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

113.  This proprietary, non-public information concerning the Company's business and prospects was known by Defendants who sold large quantities of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of Affirm and the investing public.

114.  By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

115.  As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Affirm.

**COUNT IV**

**Against the Officer Defendants for Unjust Enrichment**

116.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.   By his wrongful acts and omissions, the Officer Defendants were unjustly enriched at the expense of and to the detriment of Affirm.

118.   The Officer Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Affirm.

119.   Plaintiff, as a shareholder and representative of Affirm, seeks restitution from the Officer Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Officer Defendants from their wrongful conduct and breaches of fiduciary duty.

120.   Plaintiff, on behalf of Affirm, has no adequate remedy at law.

<strong>COUNT V</strong>

<strong>Against the Individual Defendants for Waste of Corporate Assets</strong>

121.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

123.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

124.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

125.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

<strong>PRAYER FOR RELIEF</strong>

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Affirm and that Plaintiff is an adequate representative of the Company;

B. Determining and awarding to Affirm the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C. Directing Affirm and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Affirm and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

   1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

   2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D. Determining and awarding to Affirm exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E. Awarding Affirm restitution from Defendants, and each of them;

F. Awarding Affirm Contribution from the Officer Defendants, and each of them;

G. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:     March 29, 2023                    **REICH RADCLIFFE & HOOVER LLP**

By: /s/ Adam T. Hoover
Adam T. Hoover

**LIFSHITZ LAW PLLC**

Joshua M. Lifshitz

Attorneys for Plaintiff